**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

**DEMETRIA R. THOMPSON** **PLAINTIFF**

**v.** **CIVIL NO. 2:10-CV-02114-JRM**

**MISHAEL J. ASTRUE, Commissioner of Social Security Administration** **DEFENDANT**

**MEMORANDUM OPINION**

Plaintiff brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I. Procedural Background:**

On January 23, 2008, Plaintiff protectively filed an application for supplemental security income benefits (Tr. 91-93, 106). Plaintiff alleged disability beginning January 23, 2008, due to back, neck, knee, and ankle problems (Tr. 91, 110). She reported that her impairments limited her ability to work because she could not stand or sit for very long (Tr. 110). Plaintiff was 24 years old when she applied for benefits (Tr. 91, 106). She completed the 11th grade and has past work experience as a waitress (Tr. 111, 116). She reported that she stopped working when her employer laid her off on October 31, 2007 (Tr. 110).

On November 4, 2009, the ALJ issued a decision finding Plaintiff not disabled (Tr. 37-43). The ALJ found that Plaintiff had severe impairments, including a right carotid artery aneurysm and migraine headaches, but did not have an impairment or combination of impairments that met or equaled a listing (Tr. 39). After carefully considering the entire record, the ALJ determined that Plaintiff retained the residual functional capacity to perform unskilled sedentary work (Tr. 39). He concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible (Tr. 40).

The ALJ found that Plaintiff had no past relevant work, but noted that Medical-Vocational Guideline (Grid) rule 201.24 directed a finding of "not disabled" for someone with Plaintiff's vocational profile who had the residual functional capacity to perform the full range of sedentary work (Tr. 41-42). See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.24. Because Plaintiff's limitation to unskilled work did not substantially erode the occupational base of sedentary unskilled work, the ALJ concluded that a finding of "not disabled" was appropriate under the framework of Grid rule 201.24 (Tr. 42). Id. Accordingly, the ALJ found that Plaintiff was not disabled from January 23, 2008, her alleged onset date, through November 4, 2009, the date of his decision (Tr. 42). After the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the Commissioner's final decision, which Plaintiff now appeals (Tr. 1-3).

**II. Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III. Discussion:

### A. Residual Functional Capacity:

The ALJ determined that the Plaintiff had the "residual functional capacity to perform unskilled, sedentary work as defined in 20 CFR 416.967(a) and 416.968(a). The regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary when carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a) and 416.967(a).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a) (1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own

descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

    **1. Neck, Back and Leg and Ankle Pain:**

The court notes first that in the Initial Disability Report the Plaintiff indicated that she was unable to work because of back, neck, knee, and ankle problems. She stated that "I can't stand up too long because my feet and knees start hurting. I can't sit for very long either. If I sit very long my back and my neck will start bothering me." (T. 110). In her Function Report completed March 12, 2008 the Plaintiff stated that her injuries affected her ability to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use her hands, see, and bend. She also stated that it affected her memory, concentration, and ability to complete tasks. (T. 125).

The Plaintiff was in a car accident in September 24, 1998. She presented to Dr. Alberty on October 8, 1998 and he noted that she had mild swelling around her knee but there was no ligamentous laxity, no effusion. Low back action was symmetrical and her heel and toe walk was normal. Dr. Alberty noted that there was no evidence of permanent problem. (T. 158). Dr. Alberty saw the Plaintiff on October 15 and October 23 for follow up visits. She does not appear to have been treated for these injuries subsequently. In general, the failure to obtain follow-up

treatment indicates that a person's condition may not be disabling or may not be as serious as alleged. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995) (holding "[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability"). There is no evidence that this accident affected the Plaintiff's ability to work or had any impact upon her physically.

The Plaintiff visited the SEMMC ER on November 23, 2004 complaining of "chronic pain in the back area as well as vague pain in the knee and a headache". Her primary complaint was her back pain. Dr. Nelson noted that her "deep tendon reflexes were equal bilaterally" and that she had "negative straight leg [1] raising bilaterally". (T. 276).

The Plaintiff was involved in another motor vehicle accident in April 2005 and was treated by Dr. N. Van Hoang. She complained of pain in her left leg, left knee, lower back and neck. (T. 231). She was treated by Dr. Hoang until January 2006. It does not appear that the Plaintiff sought any treatment for her injuries after her January 2006 visit. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995). Dr. Hoang performed a General Physical Examination on the Plaintiff on July 21, 2008 and found that she had a normal range of motion (T. 220) with no neurological deficits, no muscle atrophy, normal gait and no deficits in limb function. (T. 221). He diagnosed her with chronic daily headaches and chronic neck, knee, hip and back pain but, significantly, felt that she had "mild physical limitations for work". (T. 222).

---

[1]The Straight leg raise, also called Lasègue's sign, Lasègue test or Lazarevic's sign, is a test done during the physical examination to determine whether a patient with low back pain has an underlying herniated disk, mostly located at L5 (fifth lumbar spinal nerve), S1 (the first sacral spinal nerve) or S2 (the second sacral spinal nerve). (See http://en.wikipedia.org Viewed July 28, 2011).

When the Plaintiff was seen at the University of Arkansas Medical Services Women's Health Center on November 25, 2008 concerning the delivery of her third child the Plaintiff denied that she had any back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness or arthritis. An extremity evaluation noted normal alignment, no joint enlargement, crepitus, masses or tenderness and normal tone and strength. (T. 362).

There is no medical objective evidence to account for the Plaintiff's allegations of disabling pain in connection with her back, leg, knee or ankle.

**2. Cerebral aneurysm:**

The Plaintiff made no allegation in her application for benefits that she was unable to work because of her headaches. (T. 110). The fact that the plaintiff did not allege headaches as a basis for her disability in her application for disability benefits is significant, even if the evidence of headaches was later developed. See *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir.1993); *Dunahoo v. Apfel*, 241, F. 3d 1033, 1039 (8th Cir. 2001).

The only allegations the Plaintiff made at the hearing is that she could not work because of pain. The presence of pain however does not disqualify an individual from working. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). The issue of a subjective complaint of pain becomes one of credibility for the ALJ.

**B. Credibility:**

The ALJ determined that the Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the Plaintiff's statements concerning the intensity, persistence and limiting effect of these symptoms are not credible to the extent they are inconsistent with the RFC. (T. 40)

The Plaintiff made numerous complaints of subjective pain. An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* In the present case, the ALJ did discuss the factors in his credibility assessment of plaintiff.

**(1) the claimant's daily activities;**

The Plaintiff stated in her Function Report dated March 12, 2008 that she took care of her children (T. 120) with help; that she had no problem with personal care but did list some difficulties (T. 121); that she could cook or eat out; that she did the ironing and would clean her room with help (T. 122); and that she could drive, ride and shop. (T. 123). These activities do not support plaintiff's claim of disability. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)

(ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

  **(2) the duration, frequency, and intensity of the pain;**

  The Plaintiff testified that she had chronic headaches since 2001 (T. 27) when she was diagnosed with an ICA aneurysm (T. 187) . Dr. Myers ordered a Brain MRA which was performed on April 9, 2008 which noted the presence of a right ICA aneurysm but that it was "not appreciably changed from old MRA of 2001". (T. 298, 292). When the Plaintiff was admitted to UAMS on April 4, 2009 for the delivery of her third child a brain scan did show that the aneurysm had increased in size. (T. 321).

  The Plaintiff also testified that she had trouble stooping, bending and kneeling, and trouble with her back and that her knees "sometimes" feel like the are going to go out. (T. 28). She testified that she had trouble sitting and that she had to constantly move her neck. (Id.).

  It is significant that the Plaintiff treated with Dr. Hoang in 2005 for neck, back and leg pain as a result of an automobile accident but during the 7 months of treatment with Dr. Hoang she never once complained of or sought treatment or medication for headaches. In general, the failure to obtain follow-up treatment indicates that a person's condition may not be disabling or may not be as serious as alleged. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995)

(holding "[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability").

On November 25, 2008 at UAMS Women's Health Center the Musculoskeletal exam noted the Plaintiff "Denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis". The Examination of her extremities showed normal alignment, no joint enlargement, crepitus, masses or tenderness and normal tone and strength. (T. 362). None of the medical records from UAMS disclose that the Plaintiff ever complained of back pain, neck pain or knee pain and only reference her headaches. (T. 308-378).

**(3) dosage, effectiveness, and side effects of medication;**

The Plaintiff testified on June 16, 2009 that she took Lorcet and Soma for chronic pain four times per day. (T. 18). Dr. Meyers medical records discloses that he prescribed Lorcet for the Plaintiff during his treatment. (T. 279-307). The court notes that the Plaintiff did not begin to treat with Dr. Meyers until February 13, 2008 (T. 301) just after the Plaintiff had filed her disability claim on January 31, 2008. (T. 91).

In her Disability Report completed March 12, 2008 the Plaintiff represented that she was not on any medication (T. 115) but did state she was taking Lorcet and Soma for other symptoms. (T. 119). The Plaintiff was first prescribed Lorecet on April 3, 2004 when she was admitted to Sparks ER for migraine and menstrual cramps. (T. 161). The Plaintiff was not seen again until March 2005 at the Sparks ER for a migraine and lower extremity pain and she was again prescribed Lorecet. (T. 169). The Plaintiff was seen in Sparks ER in March 2005 for a spider bit but no headaches were reported and it does not appear that any pain medication was prescribed. (T. 174). The Plaintiff was prescribed Lorecet by Dr. Hoang in April 2005 for neck,

back and knee pain. (T. 231). She never made any complaint to Dr. Hoang concerning headaches nor does it appear that she sought treatment or medication after terminating treatment by Dr. Hoang until she saw Dr. Meyers in March 2008.

On August 19, 2008 a UAMS Outpatient Note shows that the Plaintiff stated that she had a headache every day but had never had any "acute severe headache" and she listed her current medication as "Lorcet p.r.n.". That same report shows that she was being treated conservatively by her treating neurosurgeon and that the Plaintiff was not interested in having surgery to correct her problem. (T. 372).  "The ALJ may properly consider both the claimant's willingness to submit to treatment and the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991) (citations omitted); *Gray v. Apfel,* 192 F.3d 799, 804 (C.A.8 (S.D.),1999).

The court also notes that a UAMS medical report dated April 4, 2009 indicated that the Plaintiff's current medication consisted only of Tylenol and PNV (prenatal multivitamins). (T. 317) and on April 6, 2009 the only medication was her PNV. (T. 321).

**(4) precipitating and aggravating factors;**

The Plaintiff had a MR Brain scan performed on February 12, 2001 as a result of fatigue and seizures (T. 185).  The exam showed a suspected aneurysm arising from the distal right internal carotid artery (Id.) which was confirmed on April 18, 2001 as a result of an Intracranial MRA. (T. 187). The Plaintiff saw Dr. Capocelli, M.D. on June 29, 2001 complaining of headache which worsened after an automobile accident in 1998. She had previously been placed

on Nortriptyline [2] which did not help. (T. 196). It appears that the Plaintiff next saw Dr. Capocelli on July 11, 2008 for a "routine follow-up on her aneurysm". At that time Dr. Capocelli noted that he had recommended cerebral angiography but that she never showed up for that. He noted that the Plaintiff was not opting for surgical intervention but showed some interest in less invasive techniques. (T. 195).

On August 19, 2008 the Plaintiff stated that she "never had any acute severe headache that would cause her to think that she had had any kind of bleed" and that she was not interested in surgery but might consider endovascular coiling". (T. 264, 372). The treatment options offered by the UAMS Neurosurgery Clinic were 1) No Intervention, 2) Coiling [3] and 3) Clipping [4]. Dr. Krisht noted that the Plaintiff would decide and get back with us. (T. 373). On November 25, 2008 a UAMS note stated that they needed to look at endovascular coiling during pregnancy or after. (T. 359).

It is clear that the first option offered by the neurosurgeon at UAMS was no intervention and the most conservative option was the one that the Plaintiff opted for. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). The Plaintiff's conservative

---

[2]Nortriptyline is in a group of drugs called tricyclic antidepressants. It affects chemicals in the brain that may become unbalanced. Nortriptyline is used to treat symptoms of depression. Nortriptyline may also be used for other purposes. (See www.drugs.com Viewed July 28, 2011).

[3]With endovascular coiling, the surgeon feeds a soft, flexible wire into the aneurysm via a catheter. The wire coils inside the aneurysm, causing a blood clot that seals off the aneurysm from the artery. (See www.mayoclinic.com Viewed July 29, 2011).

[4]In direct surgical repair with the patient under general anesthesia, the aneurysm is approached through a craniotomy. (See www.mayoclinic.com)

choice and her refusal to allow surgery indicates that her pain is not as disabling as she contends.

**(5) functional restrictions.**

The Plaintiff began to treat with Dr. Hoang, M.D. on April 12, 2005 as a result of another automobile accident complaining of low back, neck and left leg and knee pain. (T. 230-231). She treated with Dr. Hoang until January 17, 2006. (T. 223-229). It does not appear that the Plaintiff ever complained of migraine headaches during her treatment with Dr. Hoang. Thus, there was substantial evidence for the ALJ to doubt Plaintiff's complaints of disabling symptoms considering Plaintiff failed to seek more frequent and substantive treatment. *See Benskin v. Bowen*, 830 F.2d 878, 884 (8th Cir. 1987) (upholding ALJ's consideration of claimant's failure to seek medical attention where claimant's measures to relieve pain were not indicative of severe, disabling pain).

Dr. Hoang performed a General Physical Examination on the Plaintiff on July 21, 2008 and found that she had a normal range of motion (T. 220) with no neurological deficits, no muscle atrophy, normal gait and no deficits in limb function. (T. 221). He diagnosed her with chronic daily headaches and chronic neck, knee, hip and back pain but felt that she had "mild physical limitations for work". (T. 222). Dr. Hoang did not place any other physical restrictions on the Plaintiff. The opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000).

The Plaintiff first began to treat with Dr. Ronald Myers on February 13, 2008 for knee, back, and neck pain and for migraines. As the court has previously noted this was one month

after she had applied for SSI and no explanation why she would live in one state and go to another state for medical attention especially in light of the fact that she had not sought treatment for her pain previously. *See Page v. Astrue*, 484 F.3d 1040, 1043 -44 (8th Cir. 2007); *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir.1995) (Given his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability where doctor's visit linked primarily to obtaining benefits rather than medical treatment)).. *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir.1989).

It appears that Dr. Meyer continued to treat the Plaintiff with Soma[5] and Lorecet at the time. (T. 301). Dr. Myers ordered a Brain MRA which was performed on April 9, 2008 which noted the presence of a right ICA aneurysm but that it was "not appreciably changed from old MRA of 2001". (T. 298, 292). On April 16, 2008 Dr. Myers provided an Attending Physician's Statement which diagnosed the Plaintiff with chronic headaches due to a right ICA aneurysm. He felt this would interfere with attention and concentration, affect her ability to tolerate work stress. She would have to take unscheduled breaks, that she would miss more than 4 days per month, that her condition would not change and that she was not capable of working eight hours per day or 40 hours per week. (T. 296).

The Plaintiff testified that she only saw Dr. Meyers one time and after that she saw Dr. Tougas. (T. 21). The court is unsure of the training of Dr. Tougas but he appears to be a doctor of chiropractic medicine since the Wellness Clinic of Roland's prescription contains the name of Bernard M. Tougas, Jr. D.C. , PA-C. (T. 242). Based upon the Plaintiff's testimony it appears

---

[5]Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain. (See www.drugs.com Viewed July 26, 2011).

that Dr. Tougas was her treating physician not Dr. Meyers but the ALJ seems to have assumed that Dr. Meyers was her treating physician.

A treating physician's medical opinion is given controlling weight if that opinion is “well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.” 20 C.F.R. § 404.1527(d)(2). These opinions are not automatically controlling, however, because the record must be evaluated as a whole. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir.2005). We will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where “other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.” Id. at 920-21 (internal quotations omitted).

The ALJ noted that Dr. Myers’ opinions were not consistent with records from UAMS where she was “advised to progressively increase her activities over the next month and there was nothing in the records to indicate that her aneurysm or migraines would limit her. (T. 41). The ALJ noted that just eight days before writing his opinion in his Attending Physician’s Statement (T. 241) he wrote a note that the Plaintiff was to be on “light duty” until further notice. (T. .242).

In addition to being inconsistent Dr. Meyers Attending Physician’s Statement is conclusory and offers no basis for his conclusions other than the Plaintiff’s existing aneurysm. It is proper for the ALJ to decline to give weight to the vague, conclusory, and unsupported opinions of a treating physician. *See Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010). An ALJ is entitled to give less weight to an opinion that is based largely on a claimant’s subjective

complaints instead of objective medical evidence. Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).

The ALJ chose to give more weight to neurosurgeon Dr. Capocelli and Dr. Krisht than to the general practitioner Dr. Meyers. Opinions of specialists on issues within their areas of expertise are "generally" entitled to more weight than the opinions of non-specialists. See 20 C.F.R. §§ 404.1527(d) (5), 416.927(d)(5). *Guilliams v. Barnhart* 393 F.3d 798, 803 (C.A.8 (Mo.),2005), 20 C.F.R. § 404.1527

While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir.1993). As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir.2003). The court defers to the ALJ's credibility determination, especially where the testimony appears to indicate that plaintiff gave contradictory answers. *Human v. Barnhart*, 2006 WL 2422182, 3 (D.Kan.) (D.Kan.,2006). The Court believes the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984), and concludes there is substantial evidence supporting the ALJ's determination that Plaintiff's complaints were not fully credible.

**C. Grid Guidelines:**

The ALJ found that given Plaintiff's age, education, work experience, and residual functional capacity for full range of sedentary work, Grid Rule 201.24 directed a finding of not disabled (Tr. 42). 20 C.F.R. pt. 404, subpt. P, app. 2, Table No. 2, Rule 201.24. If the findings of

fact made about all of the vocational factors are the same as the corresponding criteria of a Grid Rule, the ALJ uses that rule to decide whether a person is disabled. 20 C.F.R. § 416.969. The Medical-Vocational Guidelines, 20 C.F.R. Chapter III, Part 404, Subpart P, Appendix 2, §§ 202.00-204.00, may be used by the Secretary to meet the burden of showing availability of jobs in the national economy, which a claimant may perform, if claimant's characteristics identically match those contained in the Guidelines. Id. at 1339; *see also Foreman v. Callahan*, 122 F.3d 24, 25 (8th Cir.1997)(for exertional impairments, Secretary may carry burden by referring to the grids, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experiences with differing degrees of exertional impairments).

The Guidelines can be used to determine disability, provided that the nonexertional impairments do not significantly diminish the claimant's residual capacity to perform the activities listed in them. *Reed v. Sullivan*, 988 F.2d 812, 816 (8th Cir.1993); *Thompson v. Bowen*, 850 F.2d 346, 349-50 (8th Cir.1988).

The issue in this case is the nonexertional impairments caused by the Plaintiff's medical condition and whether that condition "significantly diminishes" the Plaintiff's RFC. The Plaintiff's complaints of pain related to her back, knee, leg and ankle are completely unsupported by the medical record and, as stated above, the credibility of the Plaintiff is for the ALJ to determine where there are inconsistent statements made by the Plaintiff. The court has previously held that the ALJ correctly discounted the allegations of pain in relation to the Plaintiff's back, knee, leg and ankle.

The ALJ fully considered Plaintiff's headaches and found that they were a severe

impairment because they imposed more than minimal limitation on Plaintiff's ability to perform basic work activities (Tr. 39). He discussed Plaintiff's testimony and Dr. Myers's opinion that Plaintiff's headaches interfered with her attention, concentration, and ability to tolerate work stress (Tr. 19, 41, 241). Accordingly, the ALJ limited Plaintiff to unskilled work, which he noted the regulations define as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time" (Tr. 41). 20 C.F.R. § 416.968(a).

Based upon the reasons set forth above the court does not find that the ALJ erred in determining that the Plaintiff's proof of pain in relation to her "headaches" did not significantly diminish her residual capacity to perform sedentary work as set forth in the Guidelines. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir.2001) (ALJ determines claimant's RFC based on all relevant evidence); *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir.2001) (deference to ALJ's opinion is appropriate when ALJ explicitly discredits claimant and gives good reason for doing so); *Reed v. Sullivan*, 988 F.2d 812, 816 (8th Cir.1993) (reliance on medical-vocational guidelines, without testimony of vocational expert, is allowed if ALJ determines that claimant's nonexertional limitations do not significantly affect claimant's RFC).

**IV. Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

Dated this 1st day of August 2011.

/s/ J. Marschewski
HONORABLE JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE